IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH

| | | |
|---|---|---|
| STANFORD HEALTH CARE,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHMARK BLUE CROSS BLUE SHIELD,<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:23-CV-01732-MJH |

OPINION

Plaintiff, Stanford Health Care, brings the within action against Defendant, Highmark Blue Cross Blue Shield, for Breach of Implied-in-Fact Contract (Count I) and Quantum Meruit (Count II), arising from Highmark's alleged failure to pay for properly billed medically necessary services, supplies, and/or equipment that Stanford rendered to Highmark's members. (ECF No. 1-1). Highmark moves for summary judgment pursuant to Fed. R. Civ. P. 56. (ECF No. 25). The matter is now ripe for consideration.

Following consideration of Highmark's Motion for Summary Judgment (ECF No. 25), the respective briefs (ECF Nos. 45, 54, and 65), supporting documents (ECF Nos. 46, 47, 55, 56, and 66) and for the following reasons, Highmark's Motion for Summary Judgment will be granted.

## I. Background

Stanford operates a medical center, located in Santa Clara County, California. (ECF No. 1-1 at ¶ 3). Stanford rendered medical care to fourteen (14) patients[1] whose health insurance

[1] Of the original 14 patient claims, only 8 remain at issue in this case.

benefits were allegedly sponsored and/or administered by Highmark. *Id* at ¶¶ 8, 10. Stanford entered into an express contract (the "BSC Contract") with California Physicians' Services, Inc. d/b/a Blue Shield of California ("BSC"), a non-party to this action, which required Stanford to treat individuals belonging to health plans sponsored and/or administered by member companies belonging to the Blue Cross Blue Shield National Accounts Program, which program includes Highmark. (ECF No. 55 at ¶ 4). Stanford acknowledges that Highmark is not a party to the BSC Contract, but Stanford asserts that the BSC Contract required Stanford to treat Highmark Members and to accept payment for services at discounted rates as listed in the BSC Contract. *Id*. at ¶ 5. Highmark members can seek care in California due to Highmark's participation in the BlueCard Program, which allows members to seek nationwide care regardless of whether Highmark has a presence in the state. *Id*. at ¶ 6. The BSC Contract contains specific provisions pertaining to requirements for authorizations and for medically necessary services, as well as procedures for claims filing, processing, dispute resolution, and eventual payment.

In addition to the BSC Contract, Stanford also contracted with Anthem Blue Cross (the "Anthem Contract"). *Id*. at ¶ 16. The Anthem Contract also contains language that provides for Blue Cross Blue Shield National Accounts Program participation. According to the Anthem Contract, in order for services to be "covered", they must be "medically necessary" pursuant to the terms of individual health benefit plans. *Id*. at ¶ 17. The Anthem contract also contains specific provisions setting requirements for authorizations and for medically necessary services, as well as procedures for claims filing, processing, dispute resolution, and eventual payment.

Stanford alleges that it provided treatment to eight patients who were beneficiaries of healthcare plans sponsored by Highmark. *Id*. at 24. Stanford asserts that Highmark failed to pay Stanford in full following its submission of bills for these patients' services. As a result, Stanford

claims that Highmark breached an implied-in-fact contract, because Highmark implicitly agreed, through industry custom and practice, to pay discounted rates to Stanford for medical services. In the alternative, Stanford asserts a claim for quantum meruit based upon the same facts.

## II. Relevant Standard

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III. Discussion

### A. Contract-Based Arguments

Both parties agree that Highmark is not a signatory or party to the two express contracts that form the basis for the dispute over Stanford's claims for payment from Highmark in this case. At various points in their respective arguments, both Highmark and Stanford seek to benefit from and/or distance themselves from the terms and provisions of the BSC and Anthem Contracts ("Contracts"). Stanford contends that Highmark is identified as an "other payor" in each of the Contracts, such that Stanford was obligated to provide services and charge reduced rates for Highmark members, and that Highmark is obligated to pay Stanford for the claims herein. (ECF No. 54 at p. 12). Highmark's contract-based arguments depend upon whether the terms set forth within the BSC and/or Anthem Contract apply to sufficiently establish a legal obligation for Highmark to make payment.

This Court agrees that the express contracts between Stanford and BSC and Anthem are significant in that they set forth terms and conditions for services, billing, claims processing, and payments that Stanford, BSC, and Anthem agreed upon. Here, Stanford and Highmark look to these Contracts to assert either claims or defenses. The services provided by Stanford to alleged Highmark members form the basis for Stanford's present claims against Highmark. However, these Contracts themselves do not establish any express contract between Stanford and Highmark. Hence, Stanford did not aver a breach of express contract claim in this case. Stanford instead argues that these two Contracts provide the intentions, expectations, and course of dealings to sufficiently establish the existence of an implied-in-fact contract that requires Highmark to pay its claims.

In addition to the BSC and Anthem Contracts, both parties acknowledge the interrelationship that these contracts have with the Blue Cross Blue Shield National Accounts Program, BlueCard Program ("Program"), which coordinates for cross-state provision of services, claims adjustments, and claims payment. The BSC and Anthem Contracts also reference this Program and policies and procedures to be followed relative to services, billing, claims adjustment, and payment. Unfortunately, none of the documents or deposition testimony in this case provide sufficient details, by way of agreements, policies, procedures, or course of dealing, to identify all necessary mutually agreed upon terms that can be applied in this case to determine whether Highmark owes any liability to Stanford for breach of contract. To reach this conclusion, this Court has analyzed Stanford's evidence and arguments concerning its implied-in-fact contract.

1. Breach of Implied-in-Fact Contract (Count I)

"The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 675 (E.D. Pa. 2015), *aff'd sub nom. Enslin v. Coca-Cola Co.*, 739 F. App'x 91 (3d Cir. 2018). As regards Stanford's claim for breach of an implied in fact contract with Highmark, Stanford must prove the following "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). "A contract implied in fact has the same legal effect as any other contract. It differs from an express contract only in the manner of its formation." *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 483 n.7 (Pa. Super. 1984). Under Pennsylvania law, "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and

whether the terms are sufficiently definite to be specifically enforced." *Golf View Office Campus P'ship v. Resolution Tr. Corp.*, No. Civ. A. 96-5597, 1997 WL 667111, at *4 (E.D. Pa. October 2, 1997) (quoting Channel Home Centers of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298–99 (3d Cir. 1986)). A contract implied-in-fact can be found by looking to the surrounding facts of the parties' dealings. Implied contracts arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. *Ingrassia Const. Co., Inc.*, 486 A.2d at 483.

To assess whether Stanford has developed facts to support the creation of an implied-in-fact contract between Stanford and Highmark, as Stanford has alleged, relevant language from the BSC and Anthem contracts must be considered.

As regards the BSC Contract, Article XII provides:

> XII. <u>OTHER PAYORS</u>
>
> 12.1 Blue Shield may contract with employers, insurance companies, associations, health and welfare trusts or other organizations to provide administrative services for plans provided by those entities that are not underwritten by Blue Shield (including both local and Blue Cross/Blue Shield National Accounts Programs). In addition, Blue Shield may extend this Agreement to managed care arrangements established by Blue Shield subsidiaries, or by persons or entities utilizing the network which Blue Shield has established pursuant to agreements with California Physicians' Service Agency, Inc. and California Physicians Insurance Corporation. All such entities shall be referred to as "Other Payors". Blue Shield shall require that the health programs of Other Payors include provisions to encourage the use of Blue Shield contracting providers.
>
> 12. 2 Hospital agrees that, in the event that Blue Shield is not the underwriter of the health plan for the Other Payor, Hospital shall look solely to Other Payor for payment for services. However, if Hospital is unable to obtain payment from any Other Payor, Blue Shield shall, upon notice from Hospital, make reasonable efforts to assist Hospital in obtaining such payments.
>
> ***

13.6 Third Party Beneficiaries. Except as specifically set forth in Article XII hereof, neither Members not any other third parties are intended by the parties hereto to be third party beneficiaries under this Agreement, and no action to enforce the terms of this Agreement may be brought against either party by any person who is not a party hereto.

(ECF No. 47-1 at pp. 25-26).

As regards the Anthem contract,

Anthem Contract

The Anthem Contract defines the term "Other Payors" as follows:

"Other Payors" means persons or entities, utilizing the Network(s)/Managed Care Network(s)/Plan Program(s) pursuant to an agreement with Anthem or an Affiliate including without limitations, other Blue Cross and/or Blue Shield Plans that are not Affiliates, and employers or insurers providing Health Benefit Plans pursuant to insured, self-administered or self-insured programs.

***

"Managed Care Network" means the Network of health care providers that have entered into contracts with Anthem and/or one or more of its Affiliates pursuant to which those providers have agreed to participate in the Anthem programs that are to be provided pursuant to the Health Benefit Plan.

***

"Plan" means Anthem, an Affiliate as designated by Anthem, and/or an Other Payor. For purposes of this Agreement, when the term "Plan" applies to an entity other than Anthem, "Plan" shall be construed to only mean such entity.

***

2.17 Appeals/Adjustment Requests. Plan and Facility acknowledge that industry standard for appeal for payment adjustment is one (1) year, however, if Facility believes a Claim has been improperly adjudicated for a Covered Service, for which Facility timely submitted a Claim to Plan, Facility must submit a request for an appeal or adjustment with Plan prior to the expiration of the applicable period of limitations for actions based on breach of contract. The request must be submitted in accordance with Plan's payment appeal or adjustment process set forth in the Provider Manual. Requests for appeals or adjustments submitted after this date will be denied for payment, and Facility will not be permitted to bill Anthem, Plan, or the Covered Individual for those services for which payment was denied.

> 2.18 Blue Cross Blue Shield Out of Area Program. Facility agrees to provide Covered Services to any person who is covered under another BCBSA out of area or reciprocal programs and to submit Claims for payment in accordance with current BCBSA Claims filing guidelines. Facility agrees to accept payment by Plan at the Anthem Rate for the equivalent Network as payment in full except Facility may bill, collect and accept compensation for Cost Shares. The provisions of this Agreement shall apply to Charges for Covered Services under the out of area or reciprocal programs. Facility further agrees to comply with other similar programs of the BCBSA. For Covered Individuals who are enrolled under BCBSA out of area or reciprocal programs, Facility shall comply with the applicable Plan's utilization management policies.
>
> ***
>
> 2.22.3 When an Other Payor utilizes the Managed Care Network, Facility shall follow such Other Payor's specified utilization review and other requirements as and to the extent that such is provided or made available to Facility prior to rendering of Covered Services. Anthem shall notify Facility of a request by an Other Payor for Facility's services through this Agreement within thirty (30) days following that request. In (sic) used in this paragraph, the term "made available to Facility" means set forth in the Health Benefit Plan the Provider Manual or Policies, or otherwise given as part of the confirmation of eligibility or prior authorization process, each as made available to Facility through a forum provided by Anthem; alternatively, such information may be conveyed to Facility by a notice given pursuant to the notice provisions of this Agreement.
>
> 2.22.4 Facility agrees that each arrangement by which Facility performs services for Covered Individuals that utilize the Managed Care Network shall constitute an independent legal relationship between Facility and that Affiliate or Other Payor; provided, that this statement shall not reduce or modify any obligation of Anthem with respect to Other Payors described herein.

(ECF No. 47-1 at pp. 87-88, 94-95).

Here, there is no question that the Blue Cross Blue Shield National Accounts Program, the BlueCard Program, is referenced within the BSC and Anthem contracts and that Highmark is a Blue Card Program participant. The significance of the BSC and Anthem Contracts, to determine the relationship between Stanford and Highmark, is that these written documents set forth protocols to establish a course of dealings from which intentions, responsibilities, and rights can be assessed, when a Highmark member seeks access to services from Stanford.

The BSC and Anthem Contracts detail expansive processes and requirements for Stanford's provision of services, billing, claim administration, dispute resolution, and payment between Stanford and BSC and Anthem. However, each contract expressly limits many of its provisions to only the direct parties to each contract. In this case, Highmark is not a party to either the BSC or Anthem Contract. Each contract defines plans, like Highmark, as "Other Payors". Provisions within each Contract reference the BlueCard Program and individual health plans, and require the parties, Stanford, BSC, and Anthem, to perform in coordination with the BlueCard Program and other individual health plans. These outside sources provide supplemental directives regarding definitions, procedures, and dispute resolution, all of which are material to Stanford's claims herein.

Notably, 'covered services', 'medically necessary' and pre-certification requirements may affect Stanford's right to claim reimbursement. These terms are contained within the Contracts and control the conduct of Stanford, BSC, and Anthem; however, for services involving Other Payors, terms and provisions from other sources, such as the BlueCard Program and/or individual health plans, likely control and determine Stanford's right to reimbursement from Other Payors. Claim submission and processing is also subject to specific time limitations and plan eligibility determinations as directed by the Contracts. However, Stanford's claims for reimbursement from Other Payors are subject to time and processing requirements that derive from the BlueCard Program and/or individual health plans. Further, dispute resolution, by way of appeal processes and arbitration, are specified within the Contracts; but they only apply to Stanford, BSC, and Anthem. These Contract provisions dictate whether or not Stanford may be entitled to reimbursement or precluded from pursuing reimbursement claims for BSC and Anthem local member patients. The Contracts expressly preclude Other Payors from these

provisions, as they are limited to the Stanford, BSC, and Anthem. Accordingly, the Contracts alone, do not provide the basis from which all necessary terms for any implied-in-fact contract between Stanford and Highmark can be discerned.

Besides the Contracts, the record consists of the deposition testimony from Jack Clifford and Kimberly Bortz, plus exhibits. The exhibits include, patient plan benefit cards, letters from Stanford to various Blue Shield addresses, including BSC, Anthem. and Highmark; claims handling notes from BSC, Anthem, and Highmark; and two health plan benefits booklets for two of the patients. There is no dispute that services were provided to these patients and that reduced billings were submitted by Stanford. Stanford submits that these facts support its entitlement to payment from Highmark. However, as can be seen from the two Contracts between Stanford and BSC and Anthem, each of their substantial provisions, which predominantly concern only the parties thereto, address *all* necessary terms to set establish their Contract relationship. The provisions define the framework for Stanford's, BSC and Anthem's course of dealing, which includes authorization for and rendition of services, charges, billings, timelines for claims and claim processing, claim processing, appeals, dispute resolution, including arbitration, and contract time limitations. As regards these Contracts, but-for Stanford's agreement to service patients and charge Other Payors reduced rates, many of the terms necessary for claim management and payment involving Other Payors, derive from sources other than the Contracts, such as from the BlueCard Program, individual health plans, etc.

Unfortunately, Stanford has not produced evidence to establish any other source to identify or define those necessary terms. Furthermore, even if the Contracts' comprehensive terms were applied to the Highmark claims at issue, which they do not, Stanford has not produced evidence that it timely complied with all conditions precedent set forth within those

Contracts to entitle it to payment for these claims. The depositions and exhibits address disputes between Stanford and Highmark that concern whether certain patients were Highmark members, whether services were properly pre-certified or authorized, whether billings were timely submitted, whether claims were submitted to the proper entity, whether they were properly and/or timely denied and/or appealed, whether arbitration was required or not, and whether or not Stanford is precluded from pursuing claims. Despite the substantial interaction that has occurred between the BSC, Anthem, Stanford, and Highmark, the record as developed and before this Court, does not present or document a course of dealing between Stanford and Highmark to provide any framework by which to resolve these disputes. For each dispute, there is no evidence to establish the mutually agreed upon terms to support Stanford's breach of contract claims against Highmark.

With regard to course of dealing, Stanford has not met its burden of proof to support its claimed implied-in-fact contract Highmark. Stanford's Corporate designee, Jack Clifford, testified regarding claims handling between Stanford and insurers. (ECF No. 47-1). Mr. Clifford testified that while he would have direct involvement with BSC and Anthem, he did not have any direct interactions with Highmark. *Id*. at p. 139. He further testified that there were no special processes for Blue Plan members. *Id*. Mr. Clifford further stated that Stanford derived its entitlement for payment from the written contracts between Stanford and Anthem and Stanford and BSC. *Id*. at 140. Mr. Clifford also testified that all billing and appeals by Stanford were processed through the local plans, like BSC and Anthem, and not the out of state plan, i.e. Highmark. *Id*. at p. 149. Mr. Clifford's testimony, that Stanford essentially had no direct connection to Highmark, leads to the inevitable conclusion that there was no course of dealing between Stanford and Highmark to support any implied-in-fact contract. Further, Stanford fails

to adduce evidence of any definite terms that would have governed an implied-in-fact arrangement between Stanford and Highmark.

Stanford has described the relationship among the parties in the following graphic:




Highmark's corporate designee, Kimberly Bortz, testified that inter plan policies (IPP) govern the responsibilities of local host plans (Anthem and BSC) and home plans (Highmark). *Id*. at p. 56. This supports Stanford's position that written contracts govern the relationship between Stanford and Anthem/BSC. The above graphic also suggests that there are, at a minimum, IPP Policies and Guidelines that govern the relationship between Highmark and BSC and Anthem. There is no evidence to provide any details from those Policies and Guidelines, or from any other source, that could fill the void to answer the many questions raised in the disputes between Stanford and Highmark over Stanford's claims. Absent such evidence, Stanford does not meet its burden in bridging the gap to form an implied contract that connects the three vertices of their triangle. At best, the evidence places Anthem/BSC at the apex between the Stanford and Highmark, but without evidence of a supporting documentation, direct interaction, or course of dealing between Stanford and Highmark, Stanford cannot establish an implied-in-fact contract. From the record evidence, consisting of the BSC and the Stanford Contracts, deposition testimony, correspondence and claims handling notes, the Court assumes that there

are other sources, such as BlueCard Program agreements, IPP policies and procedures, individual health plans, etc., that could have supplied a nexus of material terms necessary to complete the portrait of a course of dealings between Stanford and Highmark sufficient to establish the requisite terms and perhaps mutual agreement for an implied-in-fact contract. Neither the Court nor a jury is permitted to speculate in order to provide missing material terms to create a contract. Stanford did not develop record to provide necessary evidence. Therefore, Stanford ultimately does not meet its burden to establish an implied-in-fact contract where there exists insufficient evidence to show a course of dealing or identifiable terms. Absent such evidence material to the implied-in-fact contract claim, it is impossible to even consider the elements of breach or damages. Without clearly identifiable terms, there is no implied-in-fact contract, and Stanford's claim, based upon any breach of an implied-in-fact contract, fails.

Accordingly, Highmark's Motion for Summary Judgment, as regards Count I, will be granted. Judgment will be entered in Highmark's favor on the breach of implied-in-fact contract claim.

2. Quantum Meruit (Count II)

Highmark argues that Stanford's quantum meruit fails because it cannot allege that it conferred a benefit upon Highmark. Stanford contends that it clearly identified the multiple benefits conferred directly upon Highmark. Specifically, it asserts that Highmark "directly and deliberately benefited from [services provided to the Patients] because it fulfilled Highmark's obligation to secure medically necessary healthcare for its beneficiaries." In response, Highmark maintains that Stanford only conferred the benefit to the patients at issue, not Highmark, which is insufficient to support a quantum meruit claim

To state a claim for unjust enrichment and quantum meruit under Pennsylvania law, a plaintiff must allege facts sufficient to show "(1) the benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1102 (Pa. 2018).

Courts have addressed quantum meruit in the context of an insurer allegedly deriving a benefit conferred upon its insured. An indirect benefit conferred on a party is not sufficient to recover in quantum meruit. *See Advanced Orthopedics & Sports Med. Inst. v. Int'l Union of Operating Eng'rs Local 14-14B*, No. 3:19-cv-5076-BRM-ZNQ, 2019 U.S. Dist. LEXIS 223586, at *25-26 (D.N.J. Nov. 26, 2019) ("It is well-established that an insurer does not derive a benefit from services provided for an insured[.]"); *see also Travelers Indem. Co. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) ("It is counterintuitive to say that services provided to an insured are also provided to its insurer."). *See Broad St. Surgical Ctr., LLC v. UnitedHealth Group, Inc.*, No. 11-2775, 2012 U.S. Dist. LEXIS 30466, at *23 (D.N.J. March 6, 2012) (explaining the insurance company derives no benefit from services provided to patients, "indeed, what the insurer gets is a ripened obligation to pay money to the insured – which hardly can be called a benefit.") (citation omitted). Courts have repeatedly refused to recognize that a healthcare provider's services to a patient are a benefit conferred on a patient's health payor and have granted summary judgment on claims like Stanford's here in favor of insurers on that basis. *MC1 Healthcare, Inc. v. United Health Grp., Inc.*, No. 3:17-CV-01909, 2019 U.S. Dist. LEXIS 76515, at *28-29 (D. Conn. May 7, 2019) (noting "courts have repeatedly held that providers cannot bring unjust enrichment claims against insurance companies based on the services

rendered to insureds") (collecting cases); *see also Abira Med. Labs., LLC v. Cigna Health & Life Ins. Co.*, No. 24-2837-cv, 2025 U.S. App. LEXIS 12183, at *5-6 (2d Cir. May 20, 2025) (affirming dismissal of Abira's unjust enrichment/quantum meruit claim for no benefit conferred).

Here, Stanford's quantum meruit claim is premised upon Stanford having provided its services to Highmark members. Stanford's patients (Highmark's members) received the benefit of Stanford's services, not Highmark. Highmark's obligation, absent any contract that provides otherwise (and there is no such contract in the facts of this case), is to provide insurance coverage to its members in accordance with the terms of its member's respective health plan. Because Stanford lacks any evidence of a benefit that it conferred directly on Highmark, its quantum meruit claim fails as a matter of law.

Accordingly, Highmark's Motion for Summary Judgment, as regards Count II, will be granted. Judgment will be entered in Highmark's favor on the quantum meruit claim.

## IV. Conclusion

Following consideration of the foregoing and for the reasons stated in this Court's Opinion, Highmark's Motion for Summary Judgment is granted. Judgment will be entered in Highmark's favor.

A separate order will follow.

DATED this 30th day of September, 2026.

BY THE COURT:

Marilyn J. Horan

MARILYN J. HORAN
United States District Judge